UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| THE WAGNER AGENCY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:23 CV 1408 CDP |
| | ) | |
| JOHNSON & JOHNSON, INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |

## **MEMORANDUM AND ORDER**

Plaintiff The Wagner Agency alleges that Johnson & Johnson, Inc. (J&J) tortiously interfered with Wagner's reasonable expectation of continued business with American Modern Property and Casualty Company (American Modern).[1] Wagner produced insurance policies for its clients with American Modern through J&J under a sub-agency agreement.  In August of 2023 J&J notified Wagner that the Wagner Agency's appointment with American Modern had been terminated because of the overall loss ratio and profitability issues of Wagner's book of business with American Modern.

---

[1] The Wagner Agency also named American Modern as a defendant, but I granted American Modern's motion to dismiss on May 8, 2024.  ECF 35.  The Wagner Agency eventually filed an amended complaint directed solely against J&J alleging breach of contract and tortious interference with business expectancy.  ECF 75.  I dismissed the breach of contract claim (Count I) for failure to state a claim on June 9, 2025.  ECF 96.  Thus only the tortious interference claim remains.

In the sole remaining count of its amended complaint, Wagner alleges that J&J's conduct surrounding the termination of its agency appointment amounts to tortious interference with business expectancy under Missouri law. The summary judgment record shows that Wagner cannot prove the essential elements of tortious interference under Missouri law. I will therefore grant the motion for summary judgment.

## Standards Governing Summary Judgment

Summary judgment must be granted when the pleadings and proffer of evidence demonstrate that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a), (c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986); *Torgerson v. City of Rochester,* 643 F.3d 1031, 1042 (8th Cir. 2011). I must view the evidence in the light most favorable to the nonmoving party and accord her the benefit of all reasonable inferences. *Scott v. Harris,* 550 U.S. 372, 379 (2007). My function is not to weigh the evidence but to determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

The moving party bears the burden of informing the Court of the basis of its motion and demonstrating the absence of an issue for trial. *Celotex Corp.*, 477 U.S. at 323. Once a motion is properly made and supported, the nonmoving party must either proffer evidence in the record that demonstrates a genuine issue of

2

material fact or show that the moving party's proffer does not establish the absence of a genuine dispute.  Fed. R. Civ. P. 56(c)(1); *Anderson*, 477 U.S. at 248; *Conseco Life Ins. Co. v. Williams,* 620 F.3d 902, 910 (8th Cir. 2010); *Howard v. Columbia Pub. Sch. Dist.,* 363 F.3d 797, 800-01 (8th Cir. 2004).  The substantive law determines which facts are critical and which are irrelevant.  *Anderson*, 477 U.S. at 248.  Only disputes over facts that might affect the outcome will properly preclude summary judgment. *Id.*

## Background[2]

Wagner is an insurance agency that offers different types of insurance products; it places its clients with insurance carriers for coverage on various insurable risks.  Relevant to Wagner's amended complaint is one insurance product in particular – specialized marine insurance for expensive, high-performance boats that have an insured value ranging from $500,000 to more than $2 million and can travel more than 100 mph.  Wagner avers that given the cost of the high-performance boats and the greater risk associated with them, only a few insurance companies are willing to undertake the risk and offer insurance coverage.  According to Wagner, American Modern is one of the few insurance companies to offer such coverage.

---

[2] Unless stated otherwise, these facts are gleaned from the record and are undisputed.  With only a few exceptions, the parties agreed that the facts listed by each in their summary judgment statements of fact were undisputed.  ECF 113,117.

American Modern permits only a handful of insurance agencies to apply directly to American Modern for high-risk insurance coverage on behalf of their clients.  Wagner is not one of those direct-apply agencies and thus could not and cannot place its clients directly with American Modern.  Wagner, however, executed a General Agent/Broker Agreement with Midlands, a general agent that had direct access to American Modern, which allowed Wagner to provide insurance from American Modern to its clients for high-performance marine insurance.

The General Agent/Broker Agreement is attached to the amended complaint as Exhibit 1.[3]  ECF 75-1.  Under its terms, Midlands agreed to pay Wagner "as full compensation for business placed with Midlands, commissions according to those agreed upon."  *Id.*  The General Agent/Broker Agreement authorized Wagner "to collect, receive and receipt for premiums on insurance tendered by Wagner and accepted by Midlands."  *Id.*  J&J is a wholesale insurance broker that purchased Midlands in 2022.  Wagner continued to operate under the General Agent/Broker Agreement and was able to procure American Modern high-performance marine policies for its clients as a sub-agent of J&J.  The General Agent/Broker

---

[3] The Midlands agreement in the record is undated, but the Amended Complaint alleges that it was entered in or about June 2014.  ECF 75-1 at ¶ 13.  The declaration of Christopher Wagner states that Wagner was able to place policies with American Modern from "approximately 2018 through August 2023."  ECF 106 at ¶ 4.

Agreement does not mention American Modern or any other insurance company by name, it does not refer to any particular type of insurance policy (such as high-performance marine insurance) that Wagner is authorized to place, and it contains no promises of exclusivity or guarantees of business with Midlands or any insurance company, including American Modern.

In July of 2023, there was a high-profile marine accident on the Lake of the Ozarks involving several high-speed performance boats, one of which was insured by American Modern.[4]  Wagner was the sub-agent who had placed the American Modern insurance policy through J&J.  This incident brought Wagner to the attention of Dakota Hammond, American Modern's Territory Sales Manager. After reviewing Wagner's loss ratio, Hammond sent the numbers to J&J and scheduled a meeting with Lynn Mannchen, Manager of the Marine Department for J&J, to discuss the loss ratio for Wagner's entire book of policies submitted through J&J.  Hammond felt that Wagner's numbers were "concerning." Hammond deposition p. 56, l. 5-7, ECF 99-2, 103-1.  For the previous three years, American Modern had lost money on Wagner's book of policies.    American Modern believed the percentage of loss was "eye-catching.  It stood out."  *Id.* Hammond dep. p. 58, l. 16 to p. 61, l. 2.

---

[4] The boat crashed into a home, ejecting passengers and injuring eight people.

At the lunch meeting, Hammond and Mannchen discussed the problem of Wagner's profitability.  The options considered were either termination or program closure.  Program closure would mean shutting off Wagner's access to American Modern.  ECF 117 ¶ 15.  At the lunch meeting, Hammond asked Mannchen to phase out and non-renew Wagner's book of business with American Modern.  ECF 113 at ¶ 6.  American Modern could have terminated its business with Wagner without J&J's agreement.  *Id*. ¶ 7.  Based on her discussion with Hammond, Mannchen had the impression that if she did not agree to terminate Wagner's agency appointment with American Modern, it could jeopardize J&J's relationship with American Modern.  ECF 113 ¶ 8; ECF 117 ¶ 22.

Hammond told Mannchen that in order to stop accepting applications from Wagner, American Modern's procedures required J&J to request a termination of Wagner.  ECF 113 ¶ 9.  As a result of Hammond's request, Mannchen sent an email to Hammond requesting that Wagner's appointment with American Modern under J&J be terminated as soon as possible and that Wagner's existing policies be non-renewed.  *Id.*  ¶ 10.  American Modern had the final say in the decision to terminate Wagner but because J&J was a large partner of American Modern's, American Modern wanted J&J to sign off on the decision as a "collaborative decision."  Hammond dep. p. 73, l. 9-16; p. 110, l. 6-13, ECF 103-1.  Mannchen testified that J&J's agency relationship with American Modern was very important

to the company so she agreed to terminate Wagner's sub-agency.  Mannchen

deposition p. 84, l. 9-14, ECF 103-2.

     Therefore, on August 10, 2023, Mannchen sent Wagner the following e-

mail, which states in relevant part as follows:

> Effective Immediately, your agency's appointment with American Modern
> has been terminated.  Primarily the reason for this decision is based on the
> overall loss ratio and profitability of your agency's book with American
> Modern.  J&J can still help you with your risks with the other markets we
> represent and will be based on eligibility of each risk for those markets.
> They will non-renew your existing policies per insurance laws in the
> mooring state of each risk.  As your risks come up for renewal, please email
> our team on the ones you would like us to look at placing elsewhere with
> current applications so we can review for eligibility with our markets.
> Please be advised that we will not have any markets to approach on the high-
> performance vessels other than Concept and Yachtinsure at this time, so
> those risks will be difficult for us to replace for you, but happy to send your
> applications to them for review as needed.

ECF 75-2 (citation modified).  Following the termination, Mannchen told Wagner

that it was not the only agency being terminated because Wagner would not accept

the decision and she "felt backed in a corner."  Mannchen dep. p. 101, l. 1-10, ECF

103-2.   The statement that Wagner was not the only one being terminated was not

true. *Id.*

     American Modern then began to non-renew insurance policies issued to

Wagner's clients as permitted by state law.   Not all of Wagner's clients' policies

were non-renewed at that time.  ECF 113 ¶ 26.  Wagner contends that its profits

from commissions on the high-performance marine policies exceed $300,000

annually, and that its inability to place its clients with American Modern for such coverage has caused it to suffer more than $300,000 in damages.

## Discussion

In Count II of the amended complaint, Wagner alleges that J&J "intentionally induced" American Modern to terminate Wagner's agency appointment by "stating inaccurate, false and/or misleading information about Wagner and its clients." ECF 75 at 9. Wagner alleges that J&J's interference amounts to tortious interference with business expectancy under Missouri law.[5]

Under Missouri law, to prevail on a claim for tortious interference with business expectancy, Wagner must prove: 1) a valid business expectancy; 2) J&J's knowledge of the contract or relationship; 3) a breach induced or caused by J&J's intentional interference; (4) absence of justification; and (5) damages. *Rice v. Hodapp*, 919 S.W.2d 240, 245 (Mo. banc 1996) (citation omitted). Moreover, "an action for tortious interference with a business expectancy will lie against a third party only." *Farrow v. Saint Francis Medical Center*, 407 S.W.3d 579, 602 (Mo. 2013) (citation modified).

J&J moves for summary judgment on Count II on the ground that Wagner cannot prove an essential element of its claim – namely, an absence of justification

---

[5] The parties agree Missouri law applies to this dispute.

for the alleged interference.

"Absence of justification refers to the absence of a legal right to justify the actions taken." *W. Blue Print Co., LLC v. Roberts*, 367 S.W.3d 7, 20 (Mo. 2012) (citation modified).  This means that a defendant cannot be held liable for interfering with a business relationship if it had an unqualified right to perform the act.  *Rice v. Hodapp,* 919 S.W.2d 240, 245 (Mo. banc 1996).  If the defendant has a legitimate interest, economic or otherwise, in the expectancy the plaintiff seeks to protect, then to prevail on its tortious interference claim the plaintiff must show that the defendant employed improper means in seeking to further only his or her own interests.  *Stehno v. Sprint Spectrum, L.P.*, 186 S.W.3d 247, 252 (Mo. banc 2006).

As applied here, if J&J has a legitimate interest in the business expectancy Wagner seeks to protect with American Modern, then Wagner must show that J&J employed improper means in seeking to further only its own interests with American Modern.  *Stehno*, 186 S.W.3d at 252.  "Improper means are those that are independently wrongful, such as threats, violence, trespass, defamation, misrepresentation of fact, restraint of trade, or any other wrongful act recognized by statute or common law." *Id.*  For the reasons set forth below, Wagner cannot meet its burden to show that J&J lacked justification to terminate its sub-agency appointment.

As I previously explained in my May 8, 2024, Memorandum and Order of dismissal respecting Wagner's tortious interference claim brought against American Modern, Wagner's only access to American Modern was through the 2014 General Agent/Broker Agreement as J&J's designated sub-agent.  ECF 35 at 10.  Wagner had no independent business relationship with American Modern.[6] *Id.*  There is no dispute that the marine insurance policies placed by Wagner with American Modern were solely as J&J's sub-agent.  Under these circumstances, then, J&J is not a third party to any business relationship between Wagner and American Modern.  Instead, it is a necessary party to that relationship because only J&J has an agency agreement with American Modern and a separate, sub-agency agreement with Wagner.  And it is that separate, sub-agency agreement with J&J which authorizes Wagner "to collect, receive and receipt for premiums on insurance tendered by Wagner and accepted by [J&J]."  ECF 75-1.  As J&J was the only conduit by which Wagner's clients could access American Modern's high-performance marine policies, it is not a third party to that relationship against which a tortious interference claim lies.  *Farrow*, 407 S.W.3d at 602; *Oliver v. Ford Motor Credit Co., LLC*, 437 S.W.3d 352, 360 (Mo. Ct. App. 2014); *Zipper v.*

---

[6] Although the parties mention Wagner placing some other policies with American Modern through different insurance agencies, those relationships are not at issue in this case, which is limited on its facts to the marine insurance policies placed by Wagner with American Modern as J&J's sub-agent.

*Health Midwest*, 978 S.W.2d 398, 419 (Mo. Ct. App. 1998); *Century Management, Inc. v. Spring*, 905 S.W.2d 109, 113–14 (Mo. Ct. App. 1995).

Instead, J&J terminated its own sub-agency appointment with Wagner at the direction of American Modern.  As previously discussed in my June 9, 2025, Memorandum and Order dismissing Wagner's breach of contract claim, J&J had the unqualified right to do so.  ECF 96.  The unambiguous terms of the General Agent/Broker Agreement do not obligate J&J to provide Wagner an agency appointment with American Modern or require J&J to provide any American Modern policies to Wagner's clients.  And the contract was not breached or terminated by J&J's revocation of Wagner's sub-agency appointment.  Wagner continues to place policies through J&J under the General Agent/Broker Agreement.

Given that nothing in the General Agent/Broker Agreement prevented J&J from terminating Wagner's sub-agency appointment with American Modern, Wagner can survive summary judgment only if it demonstrates that J&J lacked justification for termination of the sub-agency appointment.  This it cannot do, for there is no genuine dispute that J&J did not use "improper means" in the termination decision.  The undisputed facts demonstrate that American Modern – not J&J – initiated the termination of Wagner's sub-agency appointment.  After American Modern got hit with a high-profile marine accident claim involving a

11

client placed by Wagner, Hammond took a look at the loss ratio of Wagner's marine policies placed through J&J.  He concluded that American Modern no longer wanted Wagner's marine policies through J&J because it had lost money on Wagner's book of policies for the last three years.  Hammond called the loss ratio numbers "concerning" and "eye-catching" and relayed American Modern's decision to Mannchen of J&J.  J&J then acted in accordance with American Modern's request and revoked Wagner's sub-agency appointment.  J&J did not initiate the investigation into Wagner's loss ratio, it did not provide the loss ratio numbers to American Modern, and it did not suggest that Wagner's sub-agency appointment be terminated.  Nor has Wagner come forward with any evidence that J&J used any improper means to induce American Modern to reach that decision.[7]

Wagner argues that summary judgment is improper because it had no control over the premiums charged by American Modern, the claims made by policyholders, or loss ratio calculations.[8]  These arguments do not preclude summary judgment because they do not change the facts material to the resolution of its tortious interference claim against J&J.  Whatever the wisdom of American Modern's decision to terminate Wagner's sub-agency appointment through J&J, it

---

[7] This is not surprising, given that under the General Agent/Broker Agreement J&J also received commissions on policies Wagner placed with American Modern.

[8] Wagner does not dispute the accuracy of the calculations, but even if it did that would not preclude summary judgment on Wagner's tortious interference claim against J&J given that American Modern generated the reports, not J&J.

was made by American Modern, not J&J.  Although Hammond indicated that American Modern wanted J&J to sign off on the decision, he also acknowledged that American Modern had the final say in the decision to terminate Wagner and that American Modern wanted the Wagner sub-agency relationship terminated.

Although Wagner suggests that J&J could have refused American Modern's request because Hammond did not directly threaten to terminate American Modern's relationship with J&J if J&J did not agree to the termination, this argument misses the larger point – namely that American Modern was the insurance carrier, and there is nothing in this record to suggest that American Modern could not control who had the authority to sell its insurance as its agent. The law certainly does not require J&J to potentially impair its own agency relationship with American Modern for Wagner's sake.  Such a move would not benefit Wagner in any event, given that Wagner's relationship with American Modern was derived solely from J&J.  So even if, as Wagner suggests, its loss ratio could have been improved by cancelling some, but not all, of its book of policies, that fact is not material to the issue before me.  J&J's failure to propose alternatives to Wagner's termination when faced with American Modern's directive does not amount to "improper means" as defined by Missouri law.

Wagner makes much of the fact that Mannchen told it that other agents were also being terminated for the same reason when, in fact, no other agents were being

terminated.  Mannchen testified she told Wagner this to soften the blow because Wagner would not accept the termination.  Even if this amounts to a "misrepresentation," that still does not create a triable issue on the tortious interference claim because the misrepresentation was not made to American Modern to induce a termination.  Instead, the misrepresentation was made to Wagner after the termination decision was made and for that reason cannot constitute evidence of "improper means" as a matter of law.

Wagner has no evidence of an essential element of its tortious interference claim: absence of justification.  Instead, the undisputed evidence demonstrates that J&J, a party to the business expectancy at issue, revoked Wagner's sub-agency appointment at the express directive of American Modern.  J&J did not induce American Modern to terminate the sub-agency appointment with improper means or otherwise.  That Wagner wanted the sub-agency appointment with American Modern to continue is understandable, but its disappointment does not give rise to an actionable claim for tortious interference against J&J as a matter of law.

Finally, J&J filed a motion for sanctions with its reply brief in support of summary judgment, claiming that Wagner violated Rule 11 of the Federal Rules of Civil Procedure[9] by alleging that J&J made "inaccurate, false and/or misleading

---

[9] Rule 11 states in relevant part:

information about Wagner and its clients" to American Modern to induce

American Modern to terminate its sub-agency appointment.   ECF 75 at 9.   J&J

argues that Wagner knew when it filed the First Amended Complaint in February

of 2025 that there was no evidentiary support for this assertion because it had all

the relevant documents at that time.  ECF 115 at 5.  J&J further argues that Wagner

should have dismissed its claim after Mannchen and Hammond testified by

deposition on May 14-15, 2025.  J&J asks the Court to award it attorney's fees and

costs in defending this action as a sanction under Rule 11.  ECF 115.

    The advisory committee notes to the 1993 amendments to Rule 11 state:

"Ordinarily the motion should be served promptly after the inappropriate paper is

---

(b) Representations to the Court. By presenting to the court a pleading, written motion, or other paper—whether by signing, filing, submitting, or later advocating it—an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:

> (1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;
>
> (2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law;
>
> (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and
>
> (4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on belief or a lack of information.

Fed. R. Civ. P. 11.

filed, and, if delayed too long, may be viewed as untimely." Fed. R. Civ. P. 11 advisory committee's note to 1993 amendment.  Here, it is unclear why J&J waited so long – until the filing of its reply brief in support of summary judgment – to seek Rule 11 sanctions if the claim clearly lacked any evidentiary support as of February of 2025.  Even if the lack of factual support was not apparent until after the May depositions of Mannchen and Hammond, J&J still failed to serve Wagner with notice of its Rule 11 motion until September 10, 2025, after it had already filed its motion for summary judgment and substantially increased its costs of litigation.  Given such delay in seeking sanctions, the Court denies J&J's motion for attorney's fees and costs.  *See*, *Citizens for a Clean Environment, LLC v. Aitkin Agri-Peat, Inc.*, 2025 WL 2597347, at *19 (D. Minn. Sept. 8, 2025) (denying Rule 11 sanctions due to delay); *TRI, Inc. v. Boise Cascade Off. Prods., Inc.*, 2002 WL 31108190, at *2 (D. Minn. Sept. 20, 2002) (same).

Accordingly,

**IT IS HEREBY ORDERED** that defendant's motion for summary judgment [97] is granted, and Count II of the amended complaint is dismissed with prejudice.

**IT IS FURTHER ORDERED** that defendant's motion for sanctions [114] is denied.

As all claims are now resolved, a separate Judgment in accordance with this Memorandum and Order and the Memoranda and Orders dated May 8, 2024, and June 9, 2025, is entered this same date.

CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 18th day of November, 2025.